JOURNAL ENTRY AND OPINION
Defendant-appellant Gerard Johnson appeals from his conviction for aggravated robbery (R.C. 2911.01) with two firearm specifications. Defendant claims his conviction was against the manifest weight of the evidence. We find no error and affirm.
Defendant was charged with robbing Michelle Dent, who was on her way to deposit the day's proceeds from her place of employment, Taco Bell. The evidence at trial established that defendant had worked at the Taco Bell in question and was familiar with the procedures employed in making the deposit.
Michelle Dent testified that she had been employed at Taco Bell for thirteen years and had been a manager of the store on Warrensville Center Road in Maple Heights for three years. She was responsible for preparing and taking the daily cash deposit, usually between $2,000 to $3,200 to the First Merit Bank. Often the prepared deposit would be concealed in a regular Taco Bell paper bag and handed out through the drive-thru window by a trusted cashier at the restaurant to hide from any outside observers that a deposit was being taken.
Ms. Dent identified defendant as a former employee who worked there from March 1996 to approximately March 1997. He worked primarily as a drive-thru cashier during the morning shift, when the daily bank deposit was made. It was common knowledge among employees that the daily deposit was made at First Merit. The co-defendants' charged with participating in the robbery, Charles Dove and Damien Sample, never worked at Taco Bell and Michelle Dent did not know them.
The morning of April 15, 1998, Ms. Dent prepared her deposit as usual and proceeded to First Merit Bank in Bedford. Her Taco Bell uniform was covered up by an overcoat. There were no emblems on her clothing or car that would identify her to the outside world as a Taco Bell employee. She pulled into the parking lot at First Merit between 10:30 a.m. and 11:00 a.m. and looked around for a minute or two as she was trained to do. She folded the deposit bag over and placed it underneath her arm, got out of her automobile and proceeded toward the bank entrance. When she reached the ramp for the handicap entrance, she was approached by a man who put a gun in her back and demanded the bag. She turned and faced the man and observed that he was wearing a bandana over his face and was pointing a gun at her. She handed him the money bag. He turned, ran toward a blue Camaro, got into the passenger side and the Camaro drove away. She immediately reported the robbery to the police, but was unable to identify the robber.
Timothy Nugent testified that he was employed near the First Merit Bank. On April 15, 1998, at the time of the robbery, he saw a man running across the parking lot from First Merit toward a blue Camaro. As he approached the car, he ripped off a bandana he was wearing and threw it down to the ground. He got into the car, which sped off. Nugent was unable to tell whether anyone was in the back set of the Camaro. Later, at the police station, Nugent was able to identify the gunman from a photo array.
Bedford police officer Jerry Artl was the first officer who responded to the scene of the robbery. He spoke with Ms. Dent and Mr. Nugent and broadcast a description of the getaway car. About an hour and a half later, the suspect vehicle was involved in a hit-skip accident and was subsequently stopped in the city of Oakwood Village by Officer Vincent Ventura.
Oakwood Village Officer Vincent Ventura testified that he stopped the blue Camaro that was suspected both of the robbery and the later hit-skip accident. At that time, the only occupant in the vehicle was the driver, Charles Dove. In the car was a jacket with a large roll of cash stuffed inside the pocket.
Det. Timothy Oleksiak of the Bedford Police Department testified that he and Det. Ritter investigated the robbery. He interviewed Charles Dove after his arrest. Dove confessed to being the driver during the robbery, but initially claimed his accomplices were D and Chris and said they worked with him at Bedford Anodizing. Through independent investigation, the detectives learned that no D or Chris worked there and they confronted Dove. Dove broke down and cried and told them Chris was really defendant Gerard Johnson, a long-time friend of his, whom he did not want to implicate in the crime. He said D was someone he only knew from the street. Through further investigation, the detectives were able to determine that D was the gunman, Damien Sample.
Later that day, the detectives went to defendant's house, but he was not at home. That evening, defendant came to the police station with his girlfriend. He claimed that he had been at work that morning, got a ride home from Charles Dove and was home at 9:15 a.m., more than an hour before the robbery. His girlfriend vouched for him. Although defendant remained a suspect in the robbery, he was not immediately charged.
Detectives arrested the gunman, Damien [D] Sample, six months after the robbery when he appeared in Bedford Municipal Court for a traffic case. Upon his arrest, he gave an account of the robbery that was consistent with the Dove account. He confessed to his role as the gunman and also implicated defendant as the one who helped plan the crime. Defendant knew the routine Ms. Dent followed in making her bank drop, gave that information to the other two, and was in the car during the robbery. Defendant was then charged with participating in the robbery.
Charles Dove testified that he drove his blue Camaro to Taco Bell and then to First Merit Bank. He testified that he left work at Bedford Anodizing about 8:30 a.m. with defendant. They dropped off a couple of co-workers and then he and defendant went joy riding, smoking weed. They picked up D. He denied any plan in the robbery and claimed it was a spur of the moment thing. He said that maybe it was just a coincidence that they went to the Taco Bell while Ms. Dent was preparing her deposit, then went to the First Merit when she was attempting to make her deposit. Dove testified that defendant was with him in the car during these events, but then claimed he was not sure because at the time he was hallucinating due to the weed he was smoking. He later testified that he did not drop defendant off until an hour to an hour and a half after they bought beer after getting off work. He vacillated as to how long defendant stayed in the car. Defendant was his friend for six or seven years. Dove never worked at Taco Bell. He admitted that the $563.00 found rolled up in his coat pocket was his. He claimed he was still hallucinating when he was arrested.
Det. Ritter testified consistently with Det. Oleksiak about their investigation. He stated that approximately $2,500 was stolen from Ms. Dent. In addition, he testified that Dove did not appear to be under the influence of alcohol or drugs when the detectives interviewed him upon his arrest the day of the robbery. No narcotics, marijuana or beer cans were found in Dove's vehicle when he was arrested. He testified that, although Dove did not know D's name, the next day he showed officers where D lived, leading to the identity of Damien Sample. When detectives went to defendant's house to interview him, they were told that he was at the Value City Department Store. Det. Ritter interviewed defendant and his girlfriend when they came to the police station that evening. They both told him that defendant had gotten off work at 8:30 a.m. and had come home at 9:15 a.m. They both recalled the exact time because they had had a big argument over defendant coming home 35 minutes late.
Damien Sample testified that he pled guilty and was presently serving a three year prison term for this robbery. Sample testified that the morning of the robbery defendant and Charles Dove came over to his house at around 9:00 a.m. in Dove's blue Camaro. They told him of the plan to rob the Taco Bell manager on her way to the bank and wanted Sample to commit the robbery. This was defendant's plan because he supplied all of the details with respect to location and time of this event. It was understood that the robbery would be accomplished with a .45 caliber pistol that Sample got from the neighborhood. After they got the weapon, the three got into the car and went over to the gas station across the street from the Taco Bell. Sample got out of the car and waited for the manager. Although he did not know the manager, defendant had told Sample she would be driving a Cherokee. He watched her drive to and enter the Taco Bell and waited while she prepared the deposit as defendant had described. When she left the Taco Bell in her Cherokee, they followed her in the Camaro. When the manager got out of her car at the bank, Sample approached her from behind, pointed the gun in her back and took the money bag from her. Sample then ran back to the waiting blue Camaro and got into the front passenger seat. Defendant had moved into the back seat. They drove off to Sample's house where they divided the money.
Sample was arrested for this crime about six months later. The police informed him that Dove had been talking, so Sample gave a statement admitting to his role in the robbery and that of defendant and Dove. Sample did not know what Dove had told the police. He had not talked to Dove and the police did not tell him of their interview with Dove. Sample said they could never have accomplished this robbery without defendant's inside information. While Sample has had psychiatric problems, they affected his temperament but not his understanding or memory of what he and others did that day.
Defendant called four witnesses to testify to his alibi. Defendant's mother and girlfriend testified that defendant was home at the time the robbery occurred. At that time, defendant was at home having an argument with his girlfriend, Karicha Jones. According to Karicha, defendant usually got home from work at 8:40 a.m., but on that day he did not get home until 9:15 a.m. They therefore had an argument about him arriving home late.
Defendant's friend, Michael Artis, testified that on April 15, 1998, he also got a ride home from work from Charles Dove and that they dropped him off first. He said he called and talked to defendant at home at 10:00 or 10:15 a.m. He said he could remember this because this was their daily routine. He testified he had never discussed his ability to testify about this time frame with defendant or his family.
Defendant testified that on April 15, 1998, he got a ride home from work from Charles Dove who dropped him off at his house at 9:15 a.m. Then he and Karicha argued for an hour and a half about him being 35 minutes late. Later that day, they got some clothes out of lay away at Value City. He admitted that he had worked at Taco Bell and knew the bank deposit procedures.
Defendant's sole assignment of error states as follows:
 I. THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THERE IS NOT SUBSTANTIAL EVIDENCE UPON WHICH A TRIER OF FACT COULD REASONABLY CONCLUDE THAT THE CHARGES HAD BEEN PROVEN BEYOND A REASONABLE DOUBT.
The standard of review we must observe in passing on the manifest weight of the evidence issue was set forth by the Supreme Court of Ohio as follows in State v. Thompkins (1997), 78 Ohio St.3d 380,386-87:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149. Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. (Emphasis added.) Black's supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 (The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction).
Defendant essentially argues that the jury should not have believed the testimony of Damien Sample who testified as to defendant's role as the one who planned the robbery. Damien Sample, who was the gunman, had pled to aggravated robbery, a felony of the first degree, for his involvement in this crime and had been sentenced to three years of incarceration. The jury was apprised of that fact and was also specifically instructed as to the weight it may or may not accord accomplice testimony. Defendant's brief also attacks Sample's testimony on the grounds of his mental status. Sample testified that his psychiatric problems affected his temperament, not his understanding or memory of what he and others did that day. The jury had the opportunity to observe Sample as he testified, to assess his ability to understand and relate to others under both direct and cross-examination, and to weigh his credibility against the testimony of Charles Dove, defendant, and his alibi witnesses.
Sample's testimony does not stand alone. It is consistent with other known facts and with the common sense of the matter. Defendant was Sample's only source of inside knowledge required to commit this robbery; only persons with knowledge of the deposit procedures would have known where and when Ms. Dent was making the deposit. When Sample approached Dent, he could not have seen that she was a Taco Bell employee because her uniform was covered up by her jacket. Nor could he have seen that the bag she carried was a Taco Bell deposit bag because it was folded up and placed under her armpit. Significantly, Ms. Dent was robbed going into the bank, not coming out. This indicates that her robbers knew that she would be making a cash deposit, rather than depositing checks or withdrawing cash from the bank. This shows insider knowledge which could only have come from the defendant.
Defendant also attacks the trial testimony of the other co-conspirator, Charles Dove. Dove's testimony is not a model of credibility. He was compromised by trying to protect his long-time friend, the defendant, but did not know the right lies to tell since he had been in jail since the day of the offense. Dove initially testified that defendant was definitely in the car at the time of the robbery, then said he was not sure because he was so high and was hallucinating. This was belied by Det. Ritter who interviewed and observed Dove shortly after the robbery and testified he was not under the influence. Dove also claimed that the robbery was just a spur of the moment thing, which the jury could justifiably disbelieve because the circumstances showed obvious knowledge of Ms. Dent's daily bank deposit routine. The defendant and his accomplices stalked her. The jury could furthermore disbelieve Dove's assertion that it was mere coincidence that he, Sample and defendant were at Taco Bell when Ms. Dent was there and also ended up at the same bank where Sample robbed her of her inconspicuous money bag.
The jury could also disbelieve Dove's assertion that he never told police that defendant was involved in this robbery. An hour or so after the robbery, police arrested and interviewed the driver, Charles Dove. Dove revealed that a third person was involved, i.e., the defendant, Gerard Johnson. The detectives sought to interview defendant that very evening. Sample, however was not arrested and interviewed for six months. As of April 15, 1998, the only source of information available to the police as to the identity of the co-conspirators was Charles Dove. Thus, a jury using common sense could reject Dove's testimony that he had never implicated defendant and could discern that he must have implicated defendant or the police never would have determined on April 15, 1998 that defendant was a suspect.
The jury could also reasonably reject the alibi testimony of defendant and his witnesses who had their independent reasons to falsify testimony. They could reject as incredulous the notion that defendant, his girlfriend, and his mother all remembered the time he came home because his girlfriend was incensed at his being 35 minutes late from work and that they argued about it for one and one-half hours. The jury could also reject the testimony of his friend, who claimed he could remember exactly what time he called defendant on April 15, 1998, a full year later, and that he had never discussed his recollection or testimony with defendant.
The jury had ample opportunity to observe each of these witnesses and determine their credibility. They were properly instructed as to the effect of any impeachment of a witness and the weight to be given accomplice testimony. They had a full knowledge of the details of this crime, how it was accomplished and the inside knowledge leading to its accomplishment. The testimony of the gunman, Damien Sample, as to the source of this knowledge simply made sense: defendant, a former Taco Bell employee who worked the morning shift as a drive-thru cashier, had the knowledge of the daily bank deposit routine necessary to successfully accomplish the crime. The testimony of the credible witnesses and the whole mosaic of circumstances lead to the conclusion that defendant was intimately involved in the crime. The jury did not lose its way nor did its verdict create a miscarriage of justice. The conviction is not against the manifest weight of the evidence.
Defendant's sole assignment of error is overruled.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
 ______________________ JAMES M. PORTER, J.
JAMES D. SWEENEY, P.J., and ANNE L. KILBANE, J., CONCUR.